**John BATES, et al., and John W. Althoff, et al., Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

Nos. 96–931C, 02–967C.

United States Court of Federal Claims.

April 7, 2004.

Everett L. Bobbit and Bradley M. Fields, Bobbit & Pinckard, A.P.C., San Diego, CA, for the plaintiffs.

Virginia G. Farrier, Attorney, U.S. Department of Justice, Commercial Litigation Branch, Civil Division, for defendant. With her on the briefs were Peter D. Keisler, Assistant Attorney General, and David M. Cohen, Director.

## OPINION

BRUGGINK, Judge.

Plaintiffs are employees of the Immigration and Naturalization Service ("INS") and its subsidiary agency, the United States Border Patrol ("USBP"). Each plaintiff has filed Fair Labor Standard Act ("FLSA") claims against the United States seeking unpaid overtime. Plaintiffs were originally litigants in *Adams v. United States* (No. 96–93) and *Barnes v. United States* (No. 97–150). Their claims were severed and consolidated into the present case on September 21, 2001. On January 15, 2002, we granted defendant's motion for partial summary judgment, holding that certain plaintiffs were exempt from the overtime provisions of the FLSA. *Bates v. United States*, 51 Fed.Cl. 460 (2002). On January 18, 2002, plaintiffs filed the pending motion for summary judgment pursuant to RCFC 56 contending that they were not exempt from overtime pay requirements. Defendant filed a cross-motion for summary judgment and opposition to plaintiffs' motion on September 22, 2003.[1] Oral argument on

---

1. On October 3, 2003, we consolidated this case with *Althoff v. United States* (No. 02–967). De-

the parties' cross-motions was held on February 20, 2004.

## BACKGROUND

Plaintiffs are over 300 agents of the United States Border Patrol. Plaintiffs are not paid FLSA overtime because defendant has taken the position that plaintiffs are executive and/or administrative employees under 5 C.F.R. §§ 551.205 and 551.206 (2003), respectively, and thus exempt from entitlement to overtime pay. On May 17, 2001, defendant sent to plaintiffs a roster of eligibility periods for each plaintiff in the *Adams* and *Barnes* lawsuits. The document has been amended several times. The eligibility periods vary for each plaintiff depending on the date each plaintiff joined the litigation, as well as the dates on which plaintiffs occupied positions that were not eligible for FLSA overtime. Plaintiffs compared the government's eligibility roster against the personnel history ("PERHIS") records provided by the government. The PERHIS records list the position titles and GS level held by each of the plaintiffs, and for what periods of time. The PERHIS records also contain position title codes, which allow plaintiffs to determine whether a plaintiff was a PAIC or an APIC at any relevant time. After analyzing the PERHIS records, plaintiffs discovered several positions as to which there was disagreement over whether a plaintiff held a position entitled to overtime pay.

There remained disagreements over the following positions: (1) GS–13 Deputy Assistant Regional Director ("DARD"); (2) GS–13/14 Assistant Chief at Headquarters; (3) GS–13 Senior Tactical Coordinator; (4) GS–11/12/13 Training Instructor; (5) GS–12 Lead Border Patrol Agent; (6) GS–13 Supervisory Intelligence Officer; (7) GS–12 National Canine Facility Course Development Instructor; (8) GS–13 Director of National Canine Facility; (9) GS–14 Assistant Regional Director; (10) GS–14 Assistant Chief, BPSCC. Plaintiffs have since conceded that the GS–13 Supervisory Intelligence Officer, GS–13 Director of National Canine Facility, and GS–

14 Assistant Regional Director positions are exempt from the overtime provisions of FLSA under the executive exemption. Plaintiffs move for summary judgment as to all of the remaining positions except for the GS–14 Assistant Chief, BPSCC position. Defendant cross-moved on all remaining positions.

Defendant bases its motion for summary judgment on the argument that the remaining positions are exempt from FLSA overtime because they meet the Office of Personnel Management's ("OPM") "administrative" exemption criteria pursuant to 5 C.F.R. § 551.206. Defendant contends that the deposition testimony of the representative plaintiffs clearly demonstrates that they have responsibility for management or support services of substantial importance to the Border Patrol, perform work that is intellectual and varied in nature, and exercise discretion and independent judgment in performing their normal day-to-day work.

In their opposition, plaintiffs argue that defendant should not be allowed to rely on the administrative exemption. Even if the administrative exemption is considered, however, they contend we should reject its application.

## DISCUSSION

The 1974 amendments to the FLSA require that all agencies exempt from the overtime provisions of FLSA any employee who meets the elements of the regulations and of any such instructions as shall be issued by the OPM. 29 U.S.C. §§ 201, et seq. (1994 & Supp. III). OPM is the agency charged with responsibility for administration of the FLSA for any person employed by the government of the United States. *Id.* § 203(e)(2); 5 C.F.R. § 551.104. OPM has promulgated regulations which provide agencies with guidance regarding the payment of overtime pay pursuant to the FLSA. Pursuant to those regulations, any employee who meets the exemption criteria is exempt from FLSA overtime. 5 C.F.R. § 551.201. The only exemption category at issue here is the admin-

---

fendant's obligation to answer the complaint in *Althoff* was waived, and its pending cross-motion for summary judgment was deemed a responsive

pleading. The delay between plaintiffs' motion and defendant's cross motion was due to a stay pending the outcome of a related case on appeal.

istrative exemption.[2] We begin with a summary of the relevant regulatory provisions.

The OPM regulation regarding payment of overtime to "Administrative" employees is found at 5 C.F.R. § 551.206. Pursuant to that regulation, an administrative employee "is an advisor or assistant to management, a representative of management, or a specialist in a management or general business function or supporting service . . . ." The following three criteria for administrative employees apply to the plaintiffs who are the subject of this motion:

(a) The primary duty test. The primary duty test is met if the employee's work—

(1) significantly affects the formulation or execution of management programs and policies; or

(2) Involves management or general business functions or supporting services of substantial importance to the organization serviced; or

(3) Involves substantial participation in the executive or administrative functions of a management official.

(b) Nonmanual work test. The employee performs office or other predominantly nonmanual work which is—

(1) Intellectual and varied in nature; or

(2) Of a specialized or technical nature that requires considerable special training, experience, and knowledge.

(c) Discretion and independent judgment test. The employee frequently exercises discretion and independent judgment, under only general supervision, in performing the normal day-to-day work.

5 C.F.R. § 551.206. All three elements of the test must be met in order for the administrative exemption to apply.

One of the ways in which the government can establish that an employee satisfies the primary duty test is by showing that the employee "significantly affects the formulation or execution of management programs and policies." Pursuant to further OPM regulations, an administrative employee "significantly affect[s] the execution of management programs or policies typically when the work involves obtaining compliance with such policies by other individuals or organizations, within or outside the Federal Government, or making significant determinations furthering the operation of programs and accomplishment of program objectives." 5 C.F.R. § 551.104. The OPM regulations continue, "[a]dministrative employees engaged in such work typically perform one or more phases of program management (that is, planning, development, promoting, coordinating, controlling, or evaluation operating programs of the employing organization or of other organizations subject to regulation or other controls)." *Id.* However, the primary duty "typically means that the duty constitutes the major part (over 50 percent) of an employee's work." *Id.*

Department of Labor regulations [3] provide the following concerning the nonmanual work test:

(a) The requirement that the work performed by an exempt administrative employee must be office work or nonmanual

---

**2.** A threshold issue which we must address is whether it is appropriate for the government to assert the administrative exemption. Plaintiffs argue that defendant should not be allowed to do so, because in the *Adams* case, which resulted in the discovery and trial leading up to the severance of the claims at issue here, defendant only raised the executive exemption. Plaintiffs point to our opinion in *Adams v. United States*, 51 Fed.Cl. 57, 59 (2001), in which we stated, "The real issue here was whether the government could prove its defense that the plaintiffs were exempt under the 'executive employee' exception to the FLSA." Plaintiffs assert that, given that this action was severed from *Adams* and *Barnes*, it would be untimely and inappropriate to allow defendant to argue a different exemption here.

We disagree. We previously rejected an identical argument in *Bates v. United States*, 51 Fed. Cl. 460, 462 n. 3 (2002). We permitted the government to assert the administrative exemption, noting that no prejudice to plaintiffs resulted from allowing defendants to raise that defense, because they had been given ample time to respond on the merits. The same is true here. Defendant may raise the administrative exemption as a defense.

**3.** While "caution dictates against simply importing DOL-created standards into the federal sector without any conscious rulemaking at either DOL or OPM," *Adams v. United States*, 40 Fed. Cl. 303, 306–07 (1998), we believe it is appropriate to look to them for persuasive guidance where the OPM regulations are unclear.

work restricts the exemption to "white-collar" employees who meet the tests . . . .

(b) Section 541.2 does not completely prohibit the performance of manual work by an "administrative" employee. The performance by an otherwise exempt administrative employee of some manual work which is directly and closely related to the work requiring the exercise of discretion and independent judgment is not inconsistent with the principle that the exemption is limited to "white-collar" employees. However, if the employee performs so much manual work (other than office work) that he cannot be said to be basically a "white-collar" employee he does not qualify for exemption as a bona fide administrative employee, even if the manual work he performs is directly and closely related to the work requiring the exercise of discretion and independent judgment. . . .

29 C.F.R. § 541.203.

OPM regulations, in turn, define "discretion and independent judgment" referred to in paragraph (b) of the regulation as:

[W]ork that involves comparing and evaluating possible courses of conduct, interpreting results or implications, and independently taking action or making a decision after considering the various possibilities. However, firm commitments or final decisions are not necessary to support exemption . . . . Work reflective of discretion and independent judgment must meet the three following criteria:

(1) The work must be sufficiently complex and varied so as to customarily and regularly require discretion and independent judgment in determining the approaches and techniques to be used, and in evaluating results . . . .

(2) The employee must have the authority to make such determinations during the course of assignments. This precludes exempting trainees who are in a line of work which requires discretion but who have not

been given authority to decide discretionary matters independently. . . .

(3) The decisions made independently must be significant. The term "significant" is not so restrictive as to include only the kinds of decisions made by employees who formulate policies or exercise broad commitment authority. . . .

5 C.F.R. § 551.104.

In sum, in order to satisfy the administrative exemption, an administrative employee must be "an advisor or assistant to management, a representative of management, or a specialist in a management or general business function or supporting service" who satisfies: (1) the primary duty test; (2) the nonmanual work test; and (3) the discretion and independent judgment test. *See* 5 C.F.R. § 551.206.

I. GS–13 DARDs

■ Mr. Robert Gilbert was designated as the representative plaintiff[4] for the GS–13 DARD position.[5] Defendant contends that Gilbert's deposition testimony demonstrates that the GS–13 DARD position satisfies the requirements of the administrative exemption. As explained above, there are three ways to meet the primary duty requirement. Defendant asserts that Mr. Gilbert's testimony shows that the GS–13 DARDs satisfy the requirement that their work "significantly affects the execution of management programs and policies."

Defendant points to the following information provided in Gilbert's testimony as establishing that the work performed by GS–13 DARDs significantly affects the execution of particular programs and policies. Gilbert's testimony provides that the DARD is responsible for managing at least one of several Border Patrol programs. In addition to managing these programs, the DARD is responsible for servicing the needs of a Border Patrol Sector office.

Basically, [the DARDs] are what we refer to as program managers. There are many

---

4. The parties agreed at oral argument that our decision concerning whether a designated representative of a particular GS position is exempt from FLSA's overtime pay requirements will be binding on all class members holding the same position.

5. Gilbert testified that he occupied the position of GS–13 DARD from May 1998 to July 2001.

programs within the border patrol, whether it be training or fleet management, budget, GPRA, technology, whatever the case may be, and the DARDs are assigned to manage a program as well as be a point of contact for a sector. In other words, each of the DARDs has an assignment for a sector.

Gilbert Dep. at 14. Mr. Gilbert testified that, as a DARD, one of his program responsibilities involved the border safety initiative, under which he would work with various participants in that program to insure their compliance with the agency Memorandum of Understanding ("MOU"). Specifically, Gilbert was required to ensure that the training of the civilian air patrol complied with the terms of the MOU.

> When I was working with the border safety initiative, part of the initiative was to employ the services of the civilian air patrol. And each sector, the border safety initiative point of contact for the sector would make contact with their local civil air patrol, and in my role at the time, I actually went down and liaisoned with them.
>
> . . . .
>
> . . . [T]he local point of contact in the sector would contact their local civilian air patrol, and I went down there and would sit in on the training and make sure the memo of understanding was followed during the training . . . letting them know what their mission was . . . just basically ensuring that they knew it was a humanitarian effort and not enforcement minded.

Gilbert Dep. at 30–32. Mr. Gilbert also testified that in servicing the sectors, the role of the DARD is to act as a middleman, making recommendations to the GS–14 ARD.

> [W]hen we receive the request from the sector you work with the sector, of course, to make sure it's something . . . [to] make sure it's a true need, and then you work through your boss, let the boss know . . . that this is what is happening . . . .
>
> . . . .
>
> Q: So the GS–13 . . . is expected to gather that information, whether the need exists and what the sector has identified as the need. Is that right?

> A: Yes, and answer any questions that may arise, whether they're coming from his superiors or the regional facilities people or headquarters.

Gilbert Dep. at 37, 40. The DARDs are responsible for assisting their sectors in such areas as manpower, personnel, technologies, and other resources. For example, as to personnel, the DARD serves as a liaison between the chief, who decides sector assignments, the station, which decides station assignments, and the academy, where the trainees are located. Defendant believes the testimony discussed above establishes that the DARD position satisfies the primary duty test, because the DARDs significantly affect the execution and management of programs and policies. We note, however, that all final decisions are ultimately made by the DARD's superiors.

Defendant argues that the GS–13 DARD position satisfies the nonmanual work test because it is performed in an office setting and it is intellectual and varied in nature. Defendant points out that Mr. Gilbert's testimony establishes that the work location of the DARDs is at the Western Regional office and that the DARDs only travel to the field offices as needed. Defendant contends that the testimony discussed above also establishes that in administering a program and servicing a sector, the DARDs engage in work which is both intellectual and varied in nature.

Based on the same testimony, defendant believes the DARD position also satisfies the discretion and independent judgment test. Mr. Gilbert testified that he was responsible for gathering information and acting as a liaison between the sector and his superiors, answering any questions they might have. While the DARD does not have final decision making authority, defendant believes that this role, as a liaison and coordinator, satisfies this prong of the administrative exemption.

Plaintiffs counter that even if some of Gilbert's job duties could qualify for the primary duty test, defendant has failed to demonstrate that Gilbert spends a majority of his work involved in those duties. Furthermore,

while Gilbert's testimony demonstrates that his work is somewhat nonmanual in nature, it is not of the "white collar" variety necessary to fulfill the nonmanual work test. Finally, plaintiffs argue that Gilbert's testimony indicates that he did not take much independent action or make decisions in his role as a DARD. Because the DARD follows the instructions of others and serves as a middleman or liaison, plaintiffs contend that the DARDs' work fails the third prong of the administrative exemption.

We agree with defendant that there is no genuine issue of material fact as to whether the GS–13 DARD position satisfies the first two prongs of the administrative exemption. Gilbert's testimony makes it clear that the DARDs act as "program managers," insuring compliance with Border Patrol standards set by their superiors. As such, the DARDs' work primarily "involves obtaining compliance with [management] policies," satisfying the primary duty test. In further support of this conclusion, we also note that the DARDs' responsibility for determining sector needs and informing the chief requires the DARDs to "mak[e] significant determinations furthering the operation of programs and accomplishment of program objectives." We further agree with defendant that there is no genuine issue as to whether the DARD position satisfies the nonmanual work test. Gilbert testifies to working primarily out of the Regional office rather than in the field. Gilbert's job clearly involved the sort of desk work contemplated by this prong of the test. He was primarily responsible for supervising sector resources and ensuring compliance with Border Patrol standards, rather than physically patrolling the border or processing aliens.

However, we agree with plaintiffs that genuine issues of material fact remain as to whether the DARD position requires "discretion and independent judgment." Gilbert testified to lacking any real decision making authority, and the compliance portion of his job was naturally restricted by the terms of the MOU. Under the circumstances, we cannot find that the DARD position necessarily "involves comparing and evaluating possible courses of conduct, interpreting results or

implications, and independently taking action or making a decision after considering the various possibilities."

II. GS–13/14 Assistant Chief at Headquarters

■ Mr. John Lotz was chosen by the parties as representative for the GS–13/14 Assistant Chief position at Headquarters. Mr. Lotz was employed as a GS–13 Assistant Chief from August 1997 to October 1997 and as a GS–14 Assistant Chief after October 1997. He testified that the GS–13 and GS–14 positions are the same. The grade distinction was the result of a noncompetitive grade increase.

Defendant believes Lotz's deposition testimony establishes that the Assistant Chief position is exempt from the FLSA overtime pay requirement pursuant to the administrative exemption. Defendant argues that the Assistant Chief position satisfies the primary duty test because Lotz's work "significantly affects the formulation or execution of management programs and policies."

When asked about his duties as an Assistant Chief, Mr. Lotz testified as follows:

My duties changed quite a bit over the time that I've been here. I've done various things.

Q: Well, what were your duties in August of 1997 when you assumed the assistant chief position at the GS–13 level?

A: Primarily, I worked with the associate chief for operations, and I did contact work with the sectors. I started working a project as a result of some legislation regarding emergency medical care and ambulance transportation for illegal aliens. I was also charged with being kind of the office point of contact for the general counsel's office and worked various issues with them, including personnel issues, a lot of different things.

. . . .

Q: . . . [C]ould you give me a percentage of your overall work time that you spent in the field performing the line function of a border patrol agent?

A: 3 percent.

Q: Okay. So the 97 percent of your time spent as an assistant chief GS–13,

then, was that spent on the duties you've enumerated for me previously, working with the associate chief and contacting work with the sectors . . . ?

A: Yes. Also . . . I worked personnel issues and hiring and recruiting some also.

Lotz Dep. at 9–11. Lotz testified that as an Assistant Chief he was the point of contact between Border Patrol Headquarters and Human Resources. In this capacity, Lotz operated as a "point of contact" responsible for "learning what the problems were, bringing them back to management . . . and also carrying information from the chief of the border patrol to human resources." *Id.* at 12.

In his capacity as an assistant to the Associate Chief, Lotz helped plan and arrange specific operations such as the emergency services project for providing aid to illegal aliens. His duty was to, "[R]esearch the topic, contact general counsel's office. We attended meetings with the department and other people. We went to the field to gather information, primarily in the Tucson area." *Id.* at 14. Mr. Lotz further testified that he was the primary drafter of two congressional reports, one addressing the Tucson pilot program and the other addressing emergency health care costs for illegal aliens.

After advancing to the GS–14 level, Lotz continued to perform the same kind of work he performed as a GS–13. Lotz currently works in the technology branch doing point-of-contact and liaison work, primarily with INS' Office of Information Resource Management ("OIRM"). When asked about his duties in this capacity, Lotz testified:

We try and basically promote the interests of the border patrol, primarily the border patrol sectors in relation to OIRM policy, try to champion, if you will, problems that the sectors are having with getting services from OIRM, try to make sure that the border patrol's voice and interests are heard when OIRM is doing its business and formulating policy . . . .

*Id.* at 22. This work currently involves Lotz in promoting an architecture review plan taking place in INS. In this connection, Lotz has:

supplied resources, people to work with various groups, so that the business plan for enforcement and particularly the border patrol can be developed, giving information on what we do and how it ties into current automated information systems, where needs might be for future information systems and development, and so forth, giving information on possible hardware needs or how various hardware might meet our business needs at that point.

*Id.* at 23.

Lotz also testified that he takes on similar projects involving "little hot spots" from time to time, for example, working on issues involving Native Americans and border patrol operations on Indian reservations.

I helped the person from general counsel's office with language to the Department of Justice tribal counsel office on what the border patrol does on reservations in what is referred to as Indian country, met with the Tohono O'dahm representatives a couple times in D.C. . . . worked with general counsel's office as he was formulating . . . a plan . . . for possibly facilitating the entry of Indians across the border . . . .

*Id.* at 25.

Defendant also argues that Lotz's testimony provides evidence satisfying the non-manual work test. Defendant argues that the testimony described above establishes that Lotz's work was performed in an office setting—indeed, Lotz testified that only three percent of his work as an Assistant Chief was performed in the field. Defendant argues that this same testimony satisfies the discretion and independent judgment test. Although Lotz has no real final authority, defendant argues that Lotz's job involves the exact policy judgment at issue in the third prong of the test.

Plaintiffs do not agree. Assuming some of Lotz's job duties could qualify for the primary duty test, plaintiffs argue that defendant has failed to demonstrate that Lotz spends a majority of his work involved in those duties. Plaintiffs additionally argue that the sum and substance of Lotz's deposition demonstrates that he is nothing more than a middle man and liaison for information, without any significant effect on the

execution of policy. While he made one recommendation that was implemented on a trial basis, plaintiffs argue that defendant's arguments lack substance regarding whether or not Lotz's actions significantly affected the formulation or execution of management programs or policies.

While plaintiffs conceded at oral argument that Lotz satisfies the nonmanual work test, they maintain that Lotz's testimony indicates that he did not take much independent action or make decisions in his role as an Assistant Chief. As a middle man and liaison, it is argued, his independence was limited. As such, plaintiffs do not believe the facts regarding Lotz satisfy the discretion and independent judgment test.

There is no genuine issue of material fact as to whether the Assistant Chief at Headquarters position satisfies the administrative exemption test. Lotz's job as an assistant chief "significantly affects the formulation or execution of management programs and policies," thus satisfying the primary duty test. Lotz testified that 97% of his job involves "working with the associate chief and contacting work with the sectors." In his role as a liaison, Lotz testified to being involved in a variety of projects involving emergency medical care, ambulance transportation for illegal aliens, hiring, recruiting, and promoting the interests of the border patrol in relation to OIRM. In each of these projects Lotz's input directly effected the "formulation or execution of management programs or policies." Lotz's job required him not only to implement Border Patrol programs, but also to help develop them. Mr. Lotz was the primary drafter of two congressional reports, one addressing the Tucson pilot program and the other addressing emergency health care costs for illegal aliens. Under the circumstances, we believe there is no doubt that Lotz's job as an Assistant Chief at Headquarters satisfies the primary duty test.

The same testimony also shows that there is no genuine issue of material fact as to whether the Assistant Chief at headquarters position satisfies the discretion and independent judgment test. Under 5 C.F.R. § 551.104, "discretion and independent judgment" is defined as, "[W]ork that involves comparing and evaluating possible courses of conduct, interpreting results or implications, and independently taking action or making a decision after considering the various possibilities. However, firm commitments or final decisions are not necessary ...." The fact that Lotz never testified to having any final say is therefore irrelevant. His testimony does, however, establish that his job involved "comparing and evaluating possible courses of conduct, interpreting results or implications, and independently taking action or making a decision after considering the various possibilities." Lotz specifically testified to producing two congressional reports, managing the details of a variety of projects, taking care of "little hot spots" involving Border Patrol relations with Native Americans, and promoting the interests of the Border Patrol in relation to OIRM policy. Such duties, we believe, which characterize Lotz's obligations as an Assistant Chief at headquarters, manifest discretion and independent judgment as contemplated under the administrative exemption.

### III. GS–13 Senior Tactical Coordinators

■ Mr. Jose Marrufo was designated by the parties as the representative plaintiff for the GS–13 Senior Tactical Coordinator ("STC") position. Marrufo held this position from July 1994 until his retirement in June 2000. Defendant asserts that Mr. Marrufo's testimony provides adequate evidence that the STC position satisfies the administrative exemption.

Defendant argues that the STC position satisfies the primary duty test because Marrufo's job "significantly affects the formulation or execution of management programs and policies." When asked to describe his job duties, Marrufo testified as follows:

I was the liaison officer for the Tucson sector, liaison with the military and other law enforcement agencies, state and local, federal.

Q: When you say you were the liaison officer, does that mean there was only a single liaison officer?

A: From my agency, yes ....

....

I was responsible for all operations and engineering missions involving the military, [Joint Task Force 6] and the National Guard.

Marrufo Dep. at 7. When asked to describe the difference between operation and engineering projects, Marrufo testified:

... [L]et's say a station in the Tucson sector would request an operation with a ... helicopter ... mission from JTF6 which would involve going to the border, to the stations and detecting illegal entrance and assisting the border patrol agents at the station for that sector.

As far as engineering, I was responsible for all the landing mat fences along the Mexican border in the Tucson sector.

. . . .

Also, lighting projects or stationary lighting along the border, road work performed by the military for the sector or the station along the Mexican border.

*Id.* at 8.

Marrufo testified that he did not initiate these projects, however. The station would initiate the project and then contact an assistant chief at the sector. The assistant chief would approve or disapprove the requested project, and then pass it along to Marrufo, as STC, to work on it and act as a liaison among the interested parties, as well as conducting "legwork, reporting, everything." *Id.* at 10. In carrying out his planning duties, Marrufo would carry out INS policies and procedures. No one assisted Marrufo in compiling information or in planning operations for the border patrol.

Marrufo further testified that one of his jobs was to assist in planning, coordinating, and conducting counter narcotic and special operations in Arizona for the Border Patrol.

As far as operations that were requested, I would make sure that they met the military guidelines, as far as what the military was looking for. For example, to make sure there was a counter narcotic nexus, to make sure it would serve ... as a training mission for the military, that sort of stuff.

. . . .

... I would deal directly with the military as far as equipment needs, as far as after action reports and that sort of stuff. I was responsible for those.

*Id.* at 17–18. From time to time, Marrufo's job also required him to make recommendations to his superiors. These recommendations did not involve budgetary matters, but only issues involving the availability of equipment.

Defendant argues that Marrufo's testimony demonstrates that the STC position is "intellectual and varied in nature," thus satisfying the nonmanual work test. Defendant argues that planning and coordinating operations required Marrufo to exercise substantial judgment, and required him to consider, select, adapt, and apply law enforcement principles to numerous variables. Furthermore, defendant contends that Marrufo's liaison work with the United States military, as well as local, state, and federal law enforcement agencies required him to employ analytical reasoning, perspective, and judgment, further supporting its contention that the STC position satisfies the nonmanual work test.

Defendant also argues that Marrufo's testimony established that the STC position satisfies the discretion and independent judgment test. In planning and coordinating counter-narcotic operations, it contends that Marrufo performed work sufficiently "complex and varied" and discretionary in nature to show that the STC position meets the third prong of the administrative exemption. Defendant relies on Marrufo's testimony that his work required him to synthesize information from various sources and make recommendations based upon the evaluation of such data.

Plaintiffs, on the other hand, argue that Maruffo's testimony as to his liaison duty only shows that he passed on information and did not play any significant role in gathering or synthesizing it. Plaintiffs also argue that Marrufo had no real control over the development of policy. They further specifically contest defendant's argument that Maruffo's testimony satisfies the primary duty test. They argue that, even assuming some of Marrufo's duties may meet the primary

duty standard, sufficient evidence is lacking that Marrufo spent a majority of his work involved in those duties.

Plaintiffs characterize Marrufo as a "middle man" and a "liaison" for information, lacking any significant effect on the execution of policy. While evidence has been offered that Marrufo occasionally made recommendations, plaintiffs argue that this does not establish whether such recommendations ultimately had any effect on policy. Furthermore, plaintiffs argue that no adequate basis has been established that Marrufo's job was sufficiently "white collar" in nature to meet the nonmanual work test. Lastly, plaintiffs argue that Marrufo's testimony does not establish that he exercised any discretion or independent judgment. Again, as a "middle man," Marrufo's independence was limited.

Like the DARD position, we believe that there is no genuine issue as to whether the STC position satisfies the first two prongs of the administrative exemption. Marrufo's primary duties as a an STC "involve[d] obtaining compliance with [management] policies," thus satisfying the primary duty test. Whether involved in an operational or engineering project, Marrufo "ensured that the operation was going well in accordance with our guidelines as well as military guidelines." For the same reason, we believe the STC position is nonmanual in nature. Marrufo never testified to patrolling the border, processing aliens, or conducting any other standard Border Patrol functions. Rather, his job was to act as a middle man between different governmental agencies, ensuring compliance with Border Patrol policy, and reporting data to headquarters. However, we find that there remains a genuine issue as to whether the STC position involves discretion and independent judgment. Marrufo testified that he lacked any real decision making authority, and it is unclear how much independent thought and action was required by his job. We cannot conclude, on the record, that the STC position necessarily "involves comparing and evaluating possible courses of conduct, interpreting results or implications, and independently taking action or making a decision after considering the various possibilities."

## IV. GS–11/12/13 Training Instructor

■ Mr. Kenneth Moniere was selected as the representative plaintiff for the Training Instructor position. Moniere has been in a GS–12 Supervisory Border Patrol Agent and a GS–13 Course Instructor position since 1990. According to Moniere, since mid–1997, no permanent instructor has been employed at the GS–11 level, and all permanent instructors in the GS–12 Supervisory Border Patrol Agent position were uniformly promoted to GS–13. Moniere testified that the upgraded status did not change the agents' job duties. Therefore, we believe the GS–12 Supervisory Border Patrol Agent position and the GS–13 Training Instructor position are identical.

Defendant argues that the Training Instructor position qualifies for the administrative exemption to FLSA. Defendant contends that Moniere's testimony establishes that the Training Instructor position "significantly affects the formulation or execution of management programs and policies," and therefore satisfies the primary duty test. When asked about his job, Moniere described his duties as follows:

> As a supervisory Border Patrol agent, you have a certain number of people that you have to—well, you're responsible for. You coordinate their work and ... provide guidance in different areas.... [I]n that case it was in driver training. And also, you keep track of expenses and equipment and things of that nature.
>
> . . . .
>
> As an instructor, I just provide ... the instruction .... I conduct classes in introduction to computers now, report writing, those areas....

Moniere Dep. at. 8–9. Moniere testified that the Training Instructor position is a full time, year round position instructing border patrol trainees. At the time of his deposition, Moniere taught introduction to computers and report writing, but was going through instructor training to teach fingerprinting and courtroom testimony classes. Beyond ordinary classroom instruction, Moniere testified as to the Training Instructors' additional duties:

[T]heir duties include class preparation.... [T]hey're responsible for materials, things of that nature....

...

Usually we're responsible for time and attendance reports, logging our time ... any memos that may have been written that we have to forward to somebody.... And getting class preparation for the next class. Making handouts if needed, things like that .... Getting the class ready to go and make sure that everything is there ... checking ... out projectors and anything we're going to have to use, whether it's magic markers or the board....

*Id.* at 17, 38–39. Moniere testified that he has no authority to set or modify the curriculum. Any direct changes come down from Moniere's direct supervisor. Changes in the curriculum are based on the needs of the academy, or the needs in the field:

Q: Okay. The changes in the curriculum are based upon the changes in the academy needs?

A: That's correct, or the needs in the field. A lot of times the need in the field will dictate—If they're having a lot of problems with accidents, you know, it's a van accident, they'll want to put an emphasis on more training on vans. That did happen a couple of times.

...

Q: Okay. So the example you've given where there was an increased need for van training, the course was altered so that four wheel drive training was reduced by half and you were able to add two hours of van training; is that correct?

A: That's correct....

*Id.* at 34.

Moniere also testified that his classes are not necessarily graded, but "critiqued." "It's an exposure course and at the end of each course ... they have a project, like at the end of introduction to computers, they begin their first memo which we formatted, and we critique how their memo is written." *Id.* at 35. Moniere described the critique process as "hands on." In his report writing class, Moniere critiques the language used in the students' draft reports, showing them how to be more effective report writers.

As a GS–12, Moniere did assign grades in other classes. In such classes, if a student fails, the Training Instructor is required to establish a record of the student's deficiencies and counsel them in those areas. If remedial training is offered in the area, the instructor is to set the student up for remedial training. Written reports are drafted concerning failing students and passed on to the training operations supervisor. However, Moniere also testified that he had no authority to draft any exams or to adjust the grading scale.

Defendant argues that the Training Instructor position significantly affects the execution of management programs and policies because, as revealed by Moniere's testimony, the instructors must adopt new curricula to meet the dynamic needs of the academy. Defendant specifically points to Moniere's supervision of the driver training program which was implemented because border patrol agents were involved in bad traffic accidents. Defendant believes this testimony reveals that Moniere had the duty to coordinate the implementation of the new curriculum, and therefore had the power to significantly affect the execution of a management program or policy.

Defendant also asserts that the same testimony establishes that Moniere's job was "intellectual and varied in nature," thus satisfying the nonmanual work test. Defendant points out that Moniere testified that his job currently does not include any of the line functions of the border patrol, but instead requires him to instruct border patrol trainees in an educational environment.

Finally, defendant argues that Moniere's position as a Training Instructor also requires discretion and independent judgment. Moniere's job, as described in his testimony, requires him to exercise discretion and independent judgment in the following circumstances: class preparation, teaching trainees, organizing additional instruction programs as needed, and critiquing students' class performance.

Plaintiffs argue that Moniere's testimony reveals that he was little more than a teacher of introductory classes with little or no discretion regarding training or curriculum development. Plaintiffs assert that the Training Instructor position fails to satisfy the primary duty test because, even assuming some of his job duties meet the test, there's no factual basis for determining that those duties took up a majority of Moniere's time. Additionally, plaintiffs state that the substance of Moniere's testimony reveals that he had no real effect on the formulation or execution of border patrol policy. While there is evidence in his deposition that Moniere made one recommendation as a result of his job, there is no evidence that the recommendation, or any of his actions, had any affect on border patrol programs or policies.

Plaintiffs also do not believe that Moniere's testimony offers an adequate basis for finding that the Training Instructor position was of the "white collar" variety necessary to fulfill the nonmanual work test. As a teacher with no control over curriculum development, plaintiffs believe Moniere's work is not sufficiently intellectual or varied in nature to meet the nonmanual work test. Finally, plaintiffs argue that Moniere's testimony does not reveal that he took any independent action or decision making in executing his job, and therefore, the Training Instructor position cannot meet that prong of the administrative exemption test.

We agree with plaintiff that genuine issues of material fact remain concerning whether the Course Instructor fulfills the requirements of the administrative exemption. While we find that there is no genuine issue as to whether the second prong of the administrative exemption is satisfied, because course instruction in the classroom is predominantly of the intellectual, "office work" variety, we believe genuine issues remain as to the other two prongs of the test.

**V. GS–12 National Canine Facility Course Development Instructor**

■ Mr. Clark Larson testified as the representative plaintiff for the position of GS–12 Course Development Instructor ("CDI"). He occupied this position from June 1992 to April 1999. The Canine Training Facility, where plaintiff worked, is located in El Paso, Texas. Defendant argues that the CDI position is exempt pursuant to the administrative exemption.

Larson joined the border patrol as a GS–9 instructor. In his position as an instructor, Larson worked alongside a GS–12 coordinator of the canine training program in the El Paso sector. There was no national program at that time, all training was conducted on a regional basis. In 1990, while Larson was still a GS–9 instructor working for the regional program, he attended a meeting involving every assistant chief over the canine programs throughout the country concerning canine instruction policy. Larson was the primary drafter of a policy statement produced by that meeting concerning deployment and training of dogs. "I actually wrote the language and somebody else put their name on it . . . ." Larson Dep. at 51.

As a CDI, Larson continued to write lesson plans and make recommendations on policy. Larson testified to having "significant" input as to the training curriculum.

> . . . [W]hen we created the facility, we had no lesson plans, for instance. We had no—nothing written down which said, "This is how we're going to train a dog and handler," and I wrote the—participated along with the training coordinator in writing the lesson plans.

*Id.* at 60. Larson testified that he participated in updating these plans periodically, and then executed them as an instructor.

Occasionally, a sector instructor would contact Larson for advice concerning training problems with a dog in the field. However, as a CDI, Larson did not give advice concerning local policy issues:

> But, say, for instance, a question came from the field . . . is it appropriate to put a dog on a particular checkpoint or something like that, those issues I did not get involved in as an instructor.
>
> . . .
>
> Q: Okay. So you were consulted more as an expert in the field of training K–9's?
>
> A: Right. How do you get a dog to do this or that. . . . You know, "a dog's eating

up my couch, what do I do," those type of things.

*Id.* at 53. Larson testified to receiving such calls on a weekly basis.

Larson also testified to exercising a certain amount of supervisory authority. He directly supervised two student aides and an animal caretaker. The student aides performed clerical work and helped take care of the dogs. Larson also supervised the detail instructors who rotated through the program to participate in the canine training program. Larson was the first line supervisor of the detail instructors and was required to make decisions concerning minor issues that might arise. "Our authority over them rested ... while they were detailed to us. If they did something that would cause them to be removed from the program, we'd make the recommendation for them to be removed ...." *Id.* at 64. Later, after being promoted to Director of the facility, Larson testified that he was responsible for evaluating the work performed by the CDIs, but the CDIs were given authority to evaluate the effectiveness of the detail instructors.

Larson had authority to make recommendations to his superiors concerning disciplinary action against a student. Although he did not have the authority to remove anyone himself, Larson testified that the director's decisions would be based on Larson's recommendations. "That decision was made by ... the directors based on my recommendations because the director has very little first hand ... interaction with the students. That's all done by the instructors." *Id.* at 54.

Testifying as to his current position as Director of the National Canine Facility, Larson described his current relationship with the CDIs beneath him as follows:

> ... [W]e have a group of 30 handlers, let's say, that come in a class. I make the assignment to one of the instructors to determine—we have to break the group up into sections, five different sections of six dogs each, and I assign one of the ... staff instructors to make those assignments. I don't actually do it. I tell him to do it and he does it.
>
> ....

> ... [A]nd also we have others who are there, detailed instructors, people from the field that we detail into us to help us with the training, and there usually is ten of those individuals in any given class.
>
> Q: Why are they detailed? Are they specialists?
>
> A: Well, they're instructors, certified instructors, and because we only have at this point two staff instructors, we can't train 30 dogs with two guys so we have to detail 10 people in, 2 instructors per section to work five sections.
>
> ....
>
> We have this 11–week cycle.... [T]he instructor students are there 10 weeks of that cycle.... The handler students are there for 6 weeks of that cycle and they come during the fifth week of the instructor course .... The last week is spent at a Border Patrol checkpoint doing on-the-job training to make sure our training transitions to the field.

*Id.* at 26–28. Larson testified to running three such sessions a year, with three weeks in between. During the break, the program procures dogs for the next class, tests them, revises lesson plans, and obtains equipment. The decision as to whether a dog went into the field was left to the instructor working with the dog. "Since I don't work directly with the dogs, I just take their recommendations...." *Id.* at 26.

Defendant takes the position that this evidence satisfies the primary duty test for the CDI position because the position is not limited to classroom instruction. Instead, it involves other responsibilities, including writing lesson plans, and making policy recommendations to the director. Therefore, the CDI position "significantly affects the formulation or execution of management programs and policies." Defendant points out that Larson drafted policy concerning the training, care, and handling of dogs and provided support for problems arising after completion of the training program. By devising lesson plans, drafting training policy, providing assistance to canine handlers, and recommending whether students should be dismissed, defendant believes Larson met the primary duty test.

Defendant further asserts that the testimony offered above satisfies the nonmanual work test because the duties of the CDI are intellectual and varied in nature. Defendant again points out that Larson had the authority to create lesson plans, develop training policy, and provide assistance to canine handlers in the field. These responsibilities, to defendant, establish that Larson's job is intellectual in nature. In addition, defendant contends that Larson testified that he did not simply apply a formula to a set of facts, but was required to evaluate a number of variables prior to reaching conclusions. For the same reason, defendant believes that Larson's testimony also satisfies the discretion and independent judgment test. Although Larson's decisions were subject to review by his superiors, he was given a wide latitude of independent authority and his recommendations and opinions were respected.

Plaintiffs respond that Larson's testimony only reveals that he was able to make recommendations to his superiors as to policy, curriculum, and dismissals. Because defendant has not shown whether any of these recommendations were ever implemented, plaintiffs argue, it would be inappropriate to find, on summary judgment, that Larson's job as a CDI "significantly affect[ed] the formulation or execution of management programs and policies." Even assuming that some of Larson's duties could qualify for the primary duty test, as in the other positions, plaintiffs argue that there is insufficient evidence that a majority of Larson's duty could qualify for the primary duty test. Plaintiffs also argue that Larson's duty was not white collar in nature. To plaintiffs, Larson's dog-training job was more manual than nonmanual. Lastly, plaintiffs argue that the CDI position lacked any real discretion or independent judgment.

We believe there are no genuine issues of material fact as to whether the CDI position satisfies the administrative exemption. Larson's testimony establishes that Larson had a great deal of authority as to course development, policy, and oversight. The evidence provided also establishes that exercising these duties occupied a majority of his time. From his testimony, it appears that Larson is, in fact, one of the most knowledgeable members of the Border Patrol concerning dog training and handling. From early on, he has played a prominent role in the development of the Border Patrol's national dog training program. His testimony also establishes that Larson is given a great deal of independent authority to manage the dog training program and oversee the work of the trainers below him. We find that the defendant's motion as to the CDI position should be granted.

VI. GS–12 Lead Border Patrol Agent (Senior Intelligence Agent)

■ Mr. Johnny Meadors testified as the representative plaintiff for the GS–12 Lead Border Patrol Agent (Senior Intelligence Agent) ("SIA") position. Meadors has held that position since March 2000. Meadors testified that the SIA position is a nonsupervisory position charged with "running the sector intelligence unit to be as a conduit for information and intelligence flow[ing] from the field to the . . . chief border patrol agent." Meadors Dep. at 8. The Miami sector, in which Meadors works, is made up of five stations and one substation. Each station, and the substation, has a collateral intelligence agent. Collateral agents are simply senior agents who perform certain intelligence duties in addition to their regular duties. While Meadors does not supervise any full-time intelligence agents, he does lead the activities of the collateral intelligence agents throughout his sector. Meadors is the only sector-level full-time intelligence agent. The only other full-time intelligence agents are at the regional level. Meadors testified to working with the regional intelligence agents "all the time."

When asked how he "lead" these collateral intelligence agents, Meadors testified as follows:

> [W]e'll collect [the collateral agent]'s intelligence from the field or from the other field agents. They'll write a report to me. They can also call me for guidance . . . . [I]f they get contacts, they run to other intelligence type personnel in the field and I get a guide and lead them, but . . . everything I give them is like advice, because I don't have any kind of . . . supervi-

sory . . . authority to order anybody to do anything.

*Id.* at 8–9. When asked what kind of guidance he might provide, Meadors stated:

> Many of the agents that are collateral did not have an intelligence background when they took over, so I've actually . . . done a lot of training from square one. I have a prior intelligence background in the Army, so I was able to use that knowledge to guide and train them.

*Id.* at 9. Meadors testified that he travels at least once a year to every station within every sector in Florida to provide intelligence training. Since there is currently no formal intelligence officer training in the INS, Meadors has been "picking it up as I found out from other agencies. A lot of it is computer based training . . . . And then also what training I can provide as I visit the stations on an annual basis." *Id.* at 24. When asked for an example of the sort of advice he provided, Meadors stated that he attends conferences on such topics such as terrorism, and provides not only the collateral agents, but also the entire sector, with advice on relevant issues. However, Meadors testified to having no authority over changing policy. He testified to having once tried to alter daily reporting requirements but his idea was rejected.

Meadors also testified to having a specialty in fraudulent documents:

> I'm a fraudulent documents instructor as well. . . . I teach other agencies within and also out own agents about fraudulent documents. I've been trained up at the academy for that. . . . if somebody has a fraudulent document, I've been called at home. I've . . . had documents brought to me, for me to look at. And if I can't figure it out or make an obvious determination, then we send it up to the forensic document laboratory.

*Id.* at 45.

When asked about his role as information liaison, Meadors testified that he provides feedback to the agents providing him with intelligence reports, and provides them with information sent to Meadors from headquarters. Meadors testified to having the authority to determine who is to receive any such information. "I'll make the decision on who it'll go to, if the information is given down to me. If [it's] information on a maritime smuggling load, then I can use my knowledge on which stations can best use this information." *Id.* at 15. Meadors also does liaison work with Canadian officials when necessary.

As collateral intelligence agents gather intelligence, they are required to provide Meadors with a report. They also provide Meadors with quarterly intelligence reports. Meadors compiles this information and sends it to the chief patrol agent. One of Meador's duties is to produce trend analysis from the reports.

Meadors testified that about 30% of his time is spent in the field. This primarily consists of intelligence liaison work, surveillance, and intelligence gathering. Meador's liaison work in the field involves working with state, federal, and local law enforcement. Most of the surveillance work performed by Meadors has involved anti-smuggling work or criminal alien activity:

> Everybody is shorthanded in the Miami sector and so, at times I could be asked to go out with a special agent and a lot of photography, surveillance photography, sit on a target, wait to see . . . the comings and goings, and gather[ ] intelligence for a specific operation or for a specific target.
>
> . . . .
>
> . . . Surveillance is exactly that, waiting and seeing what happens with a target. Intelligence gathering could be talking to people on the street, talking to other law enforcements, that goes in with the liaison work. Intelligence gathering runs the gamut from just observation, to talking to people, to reading a newspaper.

*Id.* at 20–22. Meadors testified that, to some degree, while every border patrol agent is involved in intelligence gathering, Meador's job in the field is unique:

> So for my intelligence gathering it would be just like any other agent would do it, but I would also have my focus as pure intelligence as opposed to intelligence/operations as well, because that's my function . . . to gather the intelligence and pass it on to the people who can use it.

Q: Okay. So when you're tasked to be working on an operation or for a specific target, it's because they want you to be using your skills as the senior intelligence agent involved; is that correct?

A: That's a fair assumption, yes, ma'am.

*Id.* at 23.

Defendant argues that Meador's position satisfies the primary duty test because it "involves management or general business functions or supporting services of substantial importance to the organization serviced." Meador's job requires organization of reports from intelligence gathering, contact with intelligence agents in Canada, and calls on him to act as a conduit for information to different intelligence agents. In a post-September 11th environment, defendant argues, this work is essential. Because of Meador's intelligence training, he is an important link in the chain between headquarters and the intelligence field agents across Florida, and must use his discretion to disseminate important information to the appropriate agents.

Defendant also argues that Meador's testimony reveals that the SIA position is nonmanual. Defendant points out that Meadors testified that he spends a majority of his time in the office and only a limited amount in the field. Meador's nonmanual responsibilities include participation in the creation of monthly and weekly intelligence reports that entail statistical analysis on trends or issues of importance to the Border Patrol, and training agents in how to fill out intelligence reports. To defendant, these duties are intellectual, varied, and essentially nonmanual in nature.

Defendant further asserts that Meador's testimony provides ample evidence that the SIA position involves discretion and independent judgment. Defendant points to several instances in which Meadors exercised discretion and independent judgment. For instance, *Meadors was required to determine who would receive a particular piece of intelligence, to train agents, to fill out intelligence reports, and to create reports on criminal activity. Furthermore, defendant argues that Meador's testimony also reveals that he took a significant amount of independent ac-tion when working with informants and creating intelligence reports.

Plaintiffs argues that Meadors cannot be classified as "support personnel" for purposes of the primary duty test, but instead should be classified as a "production employee." Because the production mission of the Border Patrol is the enforcement of the nation's immigration laws, plaintiffs argue, the SIA position should be classified as a production position because it exists to facilitate the day-to-day operation of the Border Patrol. Furthermore, plaintiffs argue that none of the testimony provided by Meadors establishes that his work was of "substantial importance" to the Border Patrol.

Finally, plaintiffs argue that defendant has not shown how the creation of intelligence reports can be considered intellectual or varied in nature for purposes of the nonmanual work test. Plaintiffs further do not believe Meador's testimony provides any support for us to find that his work involved discretion and independent judgment. As an intelligence agent responsible for the creation of intelligence reports, plaintiffs argue, Meador's independence was limited.

We agree with defendant that there is no genuine issue of material fact as to whether Meador's position satisfies the administrative exemption. Meador's duty as an intelligence officer clearly "involves management or general business functions or supporting services of substantial importance to the organization serviced." Meadors testified to being the only sector-level full-time intelligence agent. His role in Florida appears crucial to the Border Patrol's intelligence program. He not only manages the intelligence for the Miami sector, but also regularly travels around Florida providing intelligence training to Border Patrol Agent. Meadors serves as a crucial link between the ground-level intelligence officers and Border Patrol policy makers. He both passes information up the chain and disseminates information out to agents working in the field. We also believe Meadors clearly meets the nonmanual work test. Meadors specifically testified to spending most of his time in the office, and even his "field" work is usually related to his

special skills as a SIA. This same testimony establishes that Meadors exercises a significant amount of discretion and independent judgment. This appears to be a natural component of his job as an intelligence agent—he must make important independent determinations in order to "gather the intelligence and pass it on to the people who can use it." Defendant's motion as to the SIA position is therefore granted.

VII. GS–14 Assistant Chief Patrol Agent at the Border Patrol Special Coordination Center

■ Mr. Walter Kittle testified as to the duties performed by the GS–14 Assistant Chief at the Border Patrol Special Coordination Center ("ACBPSCC"). Kittle occupied the position beginning in February 2000. When asked to describe the mission of the BPSCC, Kittle testified as follows:

> We support the field through coordination with Joint Task Force Six, which is a military unit that supplies counterdrug support to various federal law enforcement—well, actually state, local and federal law enforcement agencies, and we also acquire excess military equipment for our sectors and we have an intelligence unit that supplies products to headquarters, Border Patrol, and other agencies.

Kittle Dep. at 5–6. Kittle testified that the BPSCC services all sectors of the border patrol. When asked to described his duties as assistant chief at the BPSCC, Kittle stated:

> Currently I'm the first-line supervisor of the budget analyst, who is a . . . GS–9, and also I have—I'm program manager for the intelligence unit and I'm the first-line supervisor of a GS–13 supervisory intelligence research specialist.
>
> . . . .
>
> Q: In your capacity as a program manager for the intelligence unit, what duties do you perform?
>
> A: Oversight, review of products, intelligence products.
>
> Q: Are those intelligence products products that would be used throughout all sectors in the Border Patrol?
>
> A: Yes.

Q: When you say, "review of products," are you talking about products that are currently implemented in the sectors?

A: No, products that our intelligence unit produce, intelligence reports, weeklies, monthlies, quarterlies, special reports.

. . . [M]y unit, the intelligence unit, produces these reports and then I have the review—I have to review the report before they go out to the sectors and to the other agencies.

*Id.* at 6–8.

The intelligence unit described by Kittle is comprised of a GS–13 senior intelligence research specialist, three GS–12 intelligence research specialists, a GS–5 data entry clerk, and a GS–4 student aid. Kittle testified that this unit is directly supervised by the GS–13 agent whom Kittle in turn supervises. Kittle testified that he is ultimately responsible for the unit, which exists in order to:

> provide management products for headquarters and also for other law enforcement agencies to give them an idea what is taking place on originally the southwest border, but now we've included the northern border and the coastal border as far as narcotics and aliens are concerned.

*Id.* at 14. Kittle described the kind of "products" provided as:

> statistical in nature. They show various trends that headquarters uses to determine where resources would go, where infrastructure is needed, you know, on the border like fences, lights, that type of thing.
>
> Q: . . . Is there another type of product you can identify for me?
>
> A: Well, in all our weeklies and our monthlies we also have [an] officer safety section in there, items of interest, different types of smuggling methods, concealments that are being used. We have a section in there on Mexican news, any type of stuff that we see in the—that we can get from Mexico that could have an effect on the border or on operations.

*Id.* at 15.

In addition to his responsibilities as a program manager for the intelligence unit, Kit-

tle served in an oversight position to the Eastern Region.

I have eastern region coordination with the sectors in the eastern region. Any type of military support, they go through me and I coordinate it, any type of mission that they have with the military, I have to coordinate that and go to the—what they call the after-action review meetings.

Q: What is an after-action review meeting?

A: After an operation is completed, the military units and the Border Patrol sector get together and they hash out any type of problems that occurred during the operation, and I'm the liaison coordination and liaison person, headquarter representative, actually.

. . . .

Q: . . . Are there any other responsibilities in connection with your eastern region coordinator position?

A: Mainly liaison, make quarterly visits to each of the sectors to see if they need any type of military—excess military equipment or, you know, let them know what types of support is available through the military, that type of thing.

Q: Okay. And during these quarterly visits do you make arrangements to meet their support needs if they indicate a need?

A: Yes.

. . . .

Q: What role do you play in the process?

A: Basically the liaison between the sector and the individual at our office, and I have to follow up to make sure that that individual is actively searching for the requested items.

*Id.* at 9–12.

Defendant argues that the testimony discussed above establishes that the ACBPSCC position satisfies the primary duty test because the job "significantly affects the formulation or execution of management programs and policies." In defendant's opinion, the above testimony reveals that Kittle formulates or exercises management programs or policies. In particular, Kittle reviews reports produced by the intelligence unit, which he forwards to other offices within and outside the agency. Defendant contends that agency headquarters used these reports to determine where to assign equipment and resources. Therefore, by exercising supervisory responsibility over a unit that produces reports that lead to decisions by the agency's headquarters, Kittle significantly affects the execution of management programs or policies.

Defendant also argues that Kittle's testimony establishes that the work of the ACBPSCC is intellectual and varied in nature, thus satisfying the nonmanual work test. As the official at BPSCC responsible for planning and coordinating joint operations involving the Border Patrol and the United States military, defendant argues, Kittle cannot rely upon a standardized application of established procedures or precedents. Rather, he must evaluate conditions or requirements and choose the best alternative from a broad range of options. Furthermore, defendant argues that Kittle's testimony establishes that he is required to employ analytical reasoning, perspective, and judgment. Finally, defendant asserts that Kittle's testimony establishes that the ACBPSCC position requires discretion and independent judgment. Specifically, defendant asserts that Kittle's job is complex, varied, and requires a great deal of discretion in determining the approaches and techniques to be used.

While plaintiffs attempt to characterize Kittle as "nothing more than a middle man," we believe that Kittle's testimony makes it clear that his position as ACBPSCC fulfills the requirements of the administrative exemption. Not only does Kittle supervise the production of intelligence reports for national use, he also acts as eastern regional coordinator. "Any type of military support, they go through me and I coordinate it, any type of mission that they have with the military, I have to coordinate that . . . ." We believe that this testimony establishes that Kittle's job "significantly affects the formulation or execution of management programs and policies." Furthermore, it is undeniable that Kittle's job is nonmanual in nature and requires discretion and independent judgment.

The "products" produced at the BPSCC are of a wide variety, containing a broad range of information. In addition, Kittle's duties as regional coordinator evidence an exercise of discretion and independent judgment. "Coordination" of Border Patrol activities with the Military can hardly be described as a passive activity, as plaintiffs have attempted to characterize it. We believe it is undeniable that Kittle's job is "white collar" in nature and requires the exercise of discretion and independent judgment. We therefore grant defendant's motion as to the ACBPSCC position.

## CONCLUSION

For the reasons stated above, plaintiffs' motion for summary judgment is denied. Defendant's cross-motion for summary judgment is granted as to the following positions: (1) GS–13/14 Assistant Chief at Headquarters; (2) GS–12 Lead Border Patrol Agent (Senior Intelligence Agent); (3) GS–12 National Canine Facility Course Development Instructor; and (4) GS–14 Assistant Chief, BPSCC. The parties are directed to file a joint status report concerning the remaining issues to be tried by April 30, 2004.

